2020 IL App (2d) 130761-B
No. 2-13-0761
Opinion filed September 29, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07-CF-1151 |
| | ) ) | Honorable |
| WILLIE WALLS, | ) ) | Fred Foreman and Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judges, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Schostok and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Willie Walls, was found guilty of first-degree murder

(720 ILCS 5/9-1(a)(2) (West 2006)) and sentenced to 43 years' imprisonment.  In this direct

appeal, defendant argues that the trial court erred by denying his motion to suppress his statement

to police, on the basis that the statement was not voluntary.  Defendant, who was 16 years old

when the offense was committed and 17 years old when he gave his statement, also argues that the

court improperly imposed a *de facto* life sentence without determining that defendant's conduct

showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the

possibility of rehabilitation.  On September 4, 2015, we issued a Rule 23 order affirming the

conviction and sentence (*People v. Walls*, 2015 IL App (2d) 130761-U). On March 25, 2020, our supreme court entered a supervisory order directing us to vacate our 2015 order and to reconsider the sentencing issue in light of new authority. *People v Walls*, No. 119940 (Ill. Mar. 25, 2020) (supervisory order). Having examined that new authority, we now determine that defendant's sentencing hearing did not comply with the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). Accordingly, we affirm defendant's conviction but vacate his sentence and remand for resentencing.

¶ 2                                    I. BACKGROUND

¶ 3     After defendant became a suspect in the March 6, 2007, shooting death of Herman Allison, he was taken into custody on April 2, 2007, and interviewed by police officers, Detectives Dominic Cappelluti and Charles Schletz, from the Waukegan Police Department. Defendant made incriminating statements during the interview and was later charged by indictment with eight counts of first-degree murder.

¶ 4     On February 4, 2010, defendant filed an amended motion to suppress, and a hearing on defendant's motion commenced that day.

¶ 5                               A. Suppression Hearing

¶ 6     Cappelluti testified first on behalf of the State. In his 15 years of experience, he had interviewed more than 150 homicide suspects.

¶ 7     After defendant was arrested in connection with Allison's death on April 2, 2007, defendant arrived at the police station some time between 7 p.m. and 10:15 p.m. Cappelluti was not advised that defendant was at the station until about 30 minutes prior to the interview, which began at 10:46 p.m. Cappelluti escorted defendant from the booking room, asked if he needed to use the bathroom, and then took him to the interview room. Defendant had a can of soda when he

entered the interview room, and Cappelluti thought that either he or Schletz, who served as the juvenile advocate, had given it to him. The recorded interview lasted about 40 minutes.

¶ 8        Cappelluti explained that suspects under the age of 17 were considered juveniles. Because defendant was under the age of 17 at the time of the shooting, Cappelluti took the extra precaution of advising defendant of his juvenile rights and having a juvenile advocate present.

¶ 9        In the recorded interview, as Cappelluti read defendant his juvenile rights, defendant followed along and initialed each one. Defendant appeared to understand his rights and could read and write. The juvenile rights form contained warnings in addition to those given to adult suspects, one of which was that defendant could meet with his mother, parent, or guardian. When advised that he could speak with a parent or guardian, defendant expressed no desire to do so. A second additional juvenile warning was that there was a possibility that the juvenile case could be transferred to an adult court. When advised that his case could be transferred to adult court, defendant asked "my case can be transferred?" Cappelluti responded:

>        "At one point, it can be transferred in this case where after, uh, a hearing in Juvenile Court, okay? But at this point these are your juvenile rights waiver and, uh, just so you understand that's uh, always a possibility. But the good thing is that we're reading your rights because we're investigating a case, that's what you need to understand, [defendant]. Do you understand that? Okay."

Defendant replied "Yeh."

¶ 10        Cappelluti had defendant read the last paragraph of the juvenile rights form out loud. When doing so, defendant had trouble saying the word "coercion," and Cappelluti helped defendant pronounce the word. Cappelluti asked defendant whether he understood the meaning of the word,

and defendant said that he did not. Cappelluti then explained the meaning, and defendant said that he understood.

¶ 11    Cappelluti explained Schletz's role to defendant, which was to make sure that no promises were made and that Cappelluti did not violate any of defendant's rights. Cappelluti told defendant that Schletz was "here on [defendant's] behalf." Cappelluti told defendant that Schletz was present in case defendant had questions and also that Schletz would let Cappelluti know about any questions Schletz did not like. Schletz did not say anything to defendant during the interview.

¶ 12    Cappelluti testified that his interview technique was to develop a rapport with defendant and ask open-ended questions. Cappelluti's interview of a witness, Bobby Dodd, as well as information from other witnesses and sources, had led to defendant becoming a suspect in the case.

¶ 13    Cappelluti summarized the interview at the end. He did so because, from his experience, "a motion would come forward that we made promises to him before the videotape started, or there was another interview, so I usually attempt to summarize that that was the only time we spoke. I usually put that on videotape and avoid any legal issues to come forward." Cappelluti anticipated that defendant would be charged with murder but he had no opinion as to whether defendant would be charged as a juvenile or an adult.

¶ 14    Cappelluti first became aware that defendant's mother, Wanda Gooden, was at the Waukegan police station when the interview was paused for defendant to take a bathroom break. Schletz spoke to Gooden, and she did not want defendant to be interviewed further. At that point, Cappelluti stopped questioning defendant. Although Cappelluti had planned to show defendant some photos of the scene after the interview, he did not show defendant the photos, because Gooden was present.

¶ 15    Cappelluti made no promises of leniency, did not promise that defendant would be prosecuted as a juvenile, and did not promise that defendant would be out of jail before he turned 21 years of age.  In addition, there was no portion of the interview that was not recorded.

¶ 16    Schletz testified as follows.  Schletz was advised that defendant had been taken into custody on April 2, 2007, but he was not sure what time he was advised of that.  It was possible that defendant was taken from the booking room to the interview room; Schletz could not recall.

¶ 17    Schletz's role as juvenile advocate was to make sure that defendant understood his rights and that his rights were adequately protected.  Given this role, Schletz did not ask any investigative questions.  Cappelluti explained Schletz's role to defendant.  Schletz admitted that he was investigating the case.  Nevertheless, it was appropriate to use him as a juvenile advocate rather than bring in someone else from a different agency.  Schletz admitted writing something on his hand during the interview, clearing his throat, and showing his hand to Cappelluti.  Schletz could not recall what he wrote.  Schletz explained that nothing in Schletz's role as a juvenile advocate prevented him from aiding the investigator.

¶ 18    Defendant was advised of his juvenile rights as a precaution, and defendant appeared to understand his rights as they were read to him.  When defendant asked about the warning that anything he said could be used against him in a subsequent adult proceeding, Cappelluti adequately answered defendant's question.  For this reason, Schletz felt no need to offer further explanation. The same was true when defendant struggled with the word coercion; Cappelluti adequately explained the word to defendant.  Defendant did not ask to speak to a lawyer or parent.

¶ 19    After a break in the interview, Schletz was advised that Gooden was at the station. Schletz spoke with her, and she wanted to speak with defendant.  When defendant was advised that his

mother was at the station, he wanted to speak with her. Schletz was not required to contact Gooden prior to the interview, because defendant was 17 years old at the time.

¶ 20    Schletz further testified that neither he nor Cappelluti went over details of their investigation with defendant before interviewing him, neither promised that defendant would be tried as a juvenile, and neither promised that the charges would be reduced if defendant admitted involvement.

¶ 21    Gooden testified on behalf of the defense. On April 2, her daughter informed her that defendant had been arrested. In the early evening, Gooden drove to the location of the arrest and saw defendant in a Waukegan police car. North Chicago police were also present at the scene. The police did not permit Gooden to approach the squad car, and she was told not to go to the police station, because it was going to be "a while." As a result, Gooden went home for about 30 or 45 minutes. After that, she went to the Waukegan police station and was told that defendant was not there. Gooden then went to the North Chicago police station and was told that defendant was not there either. Gooden returned home for about two hours and then went back to the Waukegan police station around 7 p.m. Again, she was told that defendant was not there. From there, Gooden went to the Lake County jail, but defendant was not there. Gooden returned home for another two hours and then went back to the Waukegan police station; it was after 10 p.m. Gooden spotted the officer who arrested defendant, and he confirmed that defendant was there. At that point, Gooden was allowed to talk to defendant.

¶ 22    Defendant testified as follows. Before being interviewed, he was arrested during a traffic stop around 6:45 p.m. Defendant remained in a squad car at the scene for about 40 minutes before being taken to the Waukegan police station, where he arrived around 8 p.m. Defendant was not taken to the booking room; he was taken directly to an interview room. He waited there for about

30 minutes before Cappelluti came in and offered him a drink and bathroom access. Defendant used the bathroom and was given a soda. He and Cappelluti then returned to the interview room. Cappelluti told defendant not to worry about the case for which he was arrested; Cappelluti would be back to talk about another case. Defendant waited alone in the interview room.

¶ 23 Next, Cappelluti and Schletz came into the interview room, which was not the same room that was shown on the videotape of the recorded interview. Cappelluti said that defendant was suspected of committing a homicide, that Dodd had told Cappelluti everything, that Cappelluti had defendant's DNA and photos of the scene, and that he wanted to hear defendant's side of the story. Defendant was not given adult or juvenile *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and this interview lasted 90 minutes. Cappelluti knew that defendant was 16 years old at the time of the shooting and said that he would be tried as a juvenile. Cappelluti said that, at worst, defendant would be "out" by his twenty-first birthday.

¶ 24 Cappelluti then went to talk to the "big guys" at the station and returned. Cappelluti said to go to the other interview room and to shake hands like it was their first meeting. Defendant assumed that Cappelluti wanted to shake hands because the second interview would be recorded. Cappelluti told defendant to say "the same thing" in the second interview as he said in the first interview. Based on what Cappelluti said, defendant believed that his case was a juvenile matter and that, if he cooperated with police, he would be out of prison by age 21. According to defendant, this was the reason he participated in the recorded interview.

¶ 25 Defendant further testified that the only conversation he had with Schletz was when Schletz asked him how he was doing. Defendant was not allowed to speak to his mother until after the second interview.

¶ 26    On cross-examination, defendant could not recall whether he was given *Miranda* warnings in relation to an attempted murder charge from three years prior (2003).  Defendant took high school classes in the department of corrections for juveniles.

¶ 27    The State's rebuttal consisted of the following stipulations.  Cappelluti would testify that he never made any promises to induce defendant to implicate himself in the shooting of Allison and that he never promised that defendant would be released from prison prior to his twenty-first birthday if he made statements regarding the killing of Allison.  Schletz would testify that he was present during the recorded interview as a juvenile advocate.  Schletz did not hear Cappelluti make promises to defendant to induce him to implicate himself and did not hear Cappelluti promise defendant that he would be released from prison prior to his twenty-first birthday.

¶ 28    The trial court rendered its decision on April 26, 2010.  The court began by expressing "some concern as to the [defendant's] understanding of the role" of Schletz, stating that it was not "thoroughly explained" to defendant.  Though Schletz did not actively question defendant during the interview, he did write something on his hand as a reminder to Cappelluti, meaning that Schletz served a "hybrid role."  Still, the court found that the detectives' testimony was credible.  Both Cappelluti and Schletz testified that there was no rehearsal of statements prior to the recorded interview.  Defendant's claim that there was a rehearsal in preparation of the recorded interview was "not credible" in comparison to the detectives' testimony; there was no evidence that the detectives contrived the story and forced defendant to give the version of events they wanted to hear.

¶ 29    In watching the recorded interview, the court noted that defendant was "intelligent" and "understood the questions of the officers."  Defendant did not have an extensive education but had attended high school and had prior experience with the court system.  In addition, defendant was

young and in good physical condition, and the interview was "rather short"; the duration of his detention was not extensive. The court saw no open or overt physical or mental abuse; there were "no threats or promises, compulsion or inducement for the defendant" to implicate himself. The court further noted that the detectives stopped questioning defendant when he said that he wanted to speak with his mother. In sum, this was not a situation in which defendant's will was overcome. Accordingly, the court found that defendant's statement was voluntary and denied his motion to suppress.

¶ 30    On August 3, 2010, defendant pled guilty to one count of felony murder. The parties had no sentencing agreement, and the court imposed a sentence of 25 years' imprisonment. Defendant subsequently moved to withdraw his guilty plea, and the court allowed defendant to do so.

¶ 31                              B. Jury Trial and Sentencing

¶ 32    A jury trial commenced in May 2013, and the following evidence was adduced. An autopsy report indicated that Allison died from a gunshot wound to the chest, and defendant's DNA was found under the fingernails of Allison's left hand.

¶ 33    Dodd testified that Calvin Hearton, a drug dealer, wanted Dodd and defendant to gather information about Allison, another drug dealer, who lived next door to Dodd. Dodd arranged to buy drugs from Allison while defendant stood behind Allison's building. As Dodd sat in his car and ingested the drugs he had just purchased, defendant got into Dodd's car. Defendant said that Allison had jumped on him and that the gun accidentally discharged; defendant thought that Allison was dead. Dodd and defendant drove away, and defendant discarded his cell phone out the car window. The police recovered the cell phone.

¶ 34    Defendant's recorded interview was played for the jury, and the jury was given a transcript. During the interview, defendant told Cappelluti that the plan was to rob Allison because Allison

was a drug dealer with a lot of money. Hearton gave a gun to Dodd, who gave it to defendant. Dodd then arranged to buy drugs from Allison while defendant waited in the backyard. Defendant, showing his gun, asked Allison for money, and Allison ran inside. Defendant chased Allison into the stairwell. Allison was going upstairs and then jumped back down and fought with defendant. Defendant tried to run away, but they were already "tussling," and defendant's gun fired four times. The last shot struck Allison in the chest. Defendant drove away with Dodd and threw his cell phone out the car window.

¶ 35 The jury found defendant guilty of first-degree murder in that he knew that his acts created the strong probability of death or great bodily harm. See 720 ILCS 5/9-1(a)(2) (West 2006).

¶ 36 Defendant filed a motion for a new trial, which the trial court denied.

¶ 37 At the sentencing hearing, the State presented evidence that, in April 2003, defendant had shot an individual named Trevor Curry. Defendant was riding in the backseat of a vehicle, and the driver had stopped by Curry's apartment. When Curry approached the vehicle, one of the occupants of the vehicle asked him about drugs and made some accusation. Defendant then exited the vehicle, pointed a gun at Curry, and made another accusation about drugs. When Curry turned away, defendant shot him in the face. The case was transferred to adult court, and in June 2004 defendant pled guilty to aggravated discharge of a firearm. Defendant was sentenced to seven years' imprisonment for that offense and was on parole for it when he committed the instant offense.

¶ 38 The State also presented evidence regarding defendant's apprehension in the instant case. On April 2, 2007, police conducted a routine traffic stop of a car in which defendant was a passenger. There was a gun in the car, and defendant and the driver fled on foot. The gun was later recovered in a doghouse on the same street where police located defendant.

¶ 39    Additional evidence presented at the sentencing hearing included defendant's involvement in three fights with other inmates in jail and jail telephone recordings of him attempting to facilitate a favorable affidavit from Dodd and later stating that Dodd could not be allowed to testify at trial.

¶ 40    Two witnesses testified on defendant's half. Defendant's older sister, Monique Walls, testified that she and defendant grew up in an abandoned house with no parents and no heat; it was a tough life. Defendant wanted things that other people had, like nice clothes and shoes, but he associated with the wrong people. Defendant was convinced by two adults to commit a crime; he was trapped. However, now that defendant had a son, he was much more mature. He also obtained his general equivalency diploma while in prison. Gooden testified that she had three daughters and one younger son, defendant. Gooden asked for leniency because defendant was a juvenile at the time of the offense and was coerced by two adults, who were never charged. Like Monique, she testified that defendant had become more mature and cared deeply about his son.

¶ 41    The trial court considered the factors in aggravation and mitigation in fashioning defendant's sentence. It stated as follows. This was a case of "needless violence." However, defendant's background lacked good role models and all the "things that humanity provides to raise its young." Defendant grew up thinking that a life of violence was normal. As for his criminal history, defendant shot Curry when he was 13 years old. Defendant had been on parole for six months for that offense when he shot Allison. In addition, the court was not convinced that defendant's criminal conduct was the result of circumstances unlikely to recur; defendant's view on life was "awfully violent." In addition, there was evidence that defendant had attempted to influence Dodd's testimony. Still, a mitigating factor was that the offense was facilitated or induced by someone else, namely Hearton. Also, defendant had a dependent, a son, and was only

16 years old at the time of the offense. Based on the above, the court sentenced defendant to 43 years' imprisonment.

¶ 42    Defendant's motion to reconsider his sentence was denied, and defendant timely appealed.

¶ 43                                    II. ANALYSIS

¶ 44                                 A. Motion to Suppress

¶ 45    Defendant's first argument on appeal is that the trial court erred by denying his motion to suppress. We apply a two-part standard of review when reviewing a trial court's ruling on a motion to suppress evidence. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). Under this two-part standard, we give great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* Still, we remain free to undertake our own assessment of the facts in relation to the issues and may draw our own conclusions when deciding what relief should be granted. *Id.* Accordingly, we review *de novo* the trial court's ultimate legal ruling on whether the evidence should be suppressed. *Id.*

¶ 46    The basis for defendant's suppression argument is that his statement to police was not voluntary. "In determining whether a defendant's statements are voluntarily made, a court must look to the totality of the circumstances surrounding the making of the statements." *People v. Armstrong*, 395 Ill. App. 3d 606, 624 (2009). Circumstances to consider include the defendant's age, education, background, experience, mental capacity, and intelligence; the defendant's physical and emotional condition at the time of questioning; the duration of the questioning; and whether the defendant was subjected to physical or mental abuse by the police. *Id.* The "true test of voluntariness" is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time

he confessed. *People v. Murdock*, 2012 IL 112362, ¶ 55. No one factor is dispositive, and each case must be evaluated on its own specific facts. *Id.*

¶ 47 Before delving into defendant's arguments, we note that this case presents a unique factual situation in that defendant was 16 years old at the time of the offense but age 17 at the time he was arrested and questioned by police. Therefore, although defendant was a juvenile at the time of the offense (see *People v. Taylor*, 221 Ill. 2d 157, 161-62 (2006) (a "delinquent minor" under the Juvenile Court Act of 1987 (705 ILCS 405/5-105(3) (West 2006)) means any minor who prior to his or her seventeenth birthday has violated any state law)), he was not a juvenile at the time of the questioning (see *People v. J.S.*, 103 Ill. 2d 395, 402-03 (1984) (the Juvenile Court Act was enacted to apply to those persons who have *not yet* attained the age of 17)).[1]

¶ 48 Given the discrepancy in defendant's age between the time of the offense and the time of the questioning, it is not a certainty that defendant was entitled to the additional safeguards that apply to juveniles when questioned by police, which both parties acknowledged at oral argument. See *In re Marquita M.*, 2012 IL App (4th) 110011, ¶ 23 (taking the confession of a juvenile is a sensitive concern, and courts look at factors such as whether the juvenile had the opportunity to consult with an adult before or during interrogation, whether the police prevented the juvenile from conferring with a concerned adult, or whether the police frustrated the parent's attempt to talk with the juvenile). Moreover, our research has revealed only one case presenting this same factual scenario as to the defendant's age, and in that case the court found it proper to provide the

---

[1] Section 5-105(3) of the Juvenile Court Act (705 ILCS 405/5-105(3) (West 2014)) now defines "delinquent minor" as any minor who prior to his eighteenth birthday violates the law. See Pub. Act 98-61 (eff. Jan. 1, 2014).

additional juvenile safeguards. See *People v. Walker*, 61 Ill. App. 3d 891, 895 (1978) (where the defendant was 16 years old on the date of the offense but had turned 17 before he was questioned, it was proper for the officers to call in a juvenile officer, who remained until the defendant's confession had been reduced to writing).

¶ 49    In this case, we need not determine whether defendant was entitled to the additional juvenile safeguards when he was questioned by police. Both Cappelluti and Schletz testified that defendant was not entitled to be treated as a juvenile during the interview but that, because he was 17 years old, they took extra precautions to preempt any legal challenges to the proceedings. As a result, defendant was provided a juvenile advocate and admonished as to his juvenile *Miranda* rights. Therefore, because the decision was already made to provide defendant these juvenile safeguards, we need not decide whether he was entitled to them.

¶ 50    Indeed, defendant argues that these additional safeguards, when considered collectively with his other claims, "perpetuated" his belief that he would be treated as a juvenile. See *In re Marvin M.*, 383 Ill. App. 3d 693, 705 (2008) (a factor to consider, for both juveniles and adults, is the presence of police trickery and deceit). To this end, defendant argues that the actions of Cappelluti and Schletz reasonably led him to believe that he was a juvenile, subject to the special protections afforded a juvenile. Defendant points out that he received juvenile *Miranda* warnings; he was provided a juvenile advocate; when he asked whether his statements could be used against him in adult court, he was wrongly told that transfer of his case was a "possibility"; and Schletz failed to fulfill his role as a juvenile advocate when Cappelluti misinformed him about the transfer of his case. In addition, defendant claims that the detectives promised that he would be prosecuted as a juvenile and that he would be released from prison by age 21, obstructed his mother's attempts to speak with defendant before questioning, and employed a question-first, warning-later method

of interrogation that produced incriminating statements that were used against him at trial. According to defendant, these acts rendered his statement involuntary.

¶ 51    First, the majority of defendant's argument rests on claims of conduct that allegedly occurred outside the recorded interview, claims that the trial court specifically rejected.  The trial court rejected defendant's claims on the basis that the detectives, and not defendant, were more credible when testifying.  See *People v. $280,020 in United States Currency*, 2013 IL App (1st) 111820, ¶ 25 (we examine the evidence with deference to the trial court, which saw the witnesses and thus could better assess their credibility).

¶ 52    Contrary to defendant's claim that the detectives interviewed him twice but did not tape the first interview, the court noted that both Cappelluti and Schletz testified that there was no rehearsal of statements prior to the recorded interview and there was no evidence that the detectives contrived the story and then forced defendant to give the version of events they wanted to hear. Though defendant testified that he was never taken to a booking room but instead to an interview room where an initial 90-minute interview was not recorded, Cappelluti testified that he retrieved defendant from the booking room and then interviewed him once.  According to Cappelluti, no portion of the interview was not recorded.

¶ 53    In a similar vein, the court did not find credible defendant's claim that he was promised that he would be tried as a juvenile and released by the age of 21.  The court found that the detectives did not make promises or induce defendant to implicate himself.

¶ 54    In addition, the court found no merit to defendant's claim that the detectives obstructed him from talking to his mother prior to the recorded interview.  Rather, the court found that the detectives stopped questioning defendant as soon as he said he wanted to speak with his mother. In addition, defendant was advised of his right to speak with a parent prior to the recorded

interview, and he expressed no desire to do so. In sum, these factual findings by the trial court are entitled to deference, and we cannot say that they were against the manifest weight of the evidence.

¶ 55    That said, there is merit to defendant's claim that he was misled when he asked if his case could be transferred to adult court. In response to defendant's question, Cappelluti explained that the case could be transferred to adult court after a hearing in juvenile court and that a transfer was "always a possibility." Defendant argues that, because the law requires the transfer to adult criminal court of murder cases with 16-year-old defendants, Cappelluti misled him with this response. See 705 ILCS 405/5-130(1)(a) (West 2006) (providing for the automatic transfer of a case where the minor was charged with first-degree murder); see also *In re Marvin M.*, 383 Ill. App. 3d at 719 (a respondent's statements must not result from deceptive interrogation tactics calculated to overcome the respondent's free will). We agree that Cappelluti downplayed the reality that the case would be transferred to adult court in the event that defendant was charged with the first-degree murder of Allison. Rather than stating that a transfer was a possibility, the better answer would have been to advise defendant that his case would automatically be transferred if he was charged with first-degree murder.

¶ 56    Still, police trickery or deception will not invalidate a minor's statement as a matter of law but is only one factor to consider in the totality of the circumstances. *Id.* For example, in *In re Marvin M.*, the police told the respondent that several witnesses had implicated him in a shooting when in fact only two witnesses had implicated him, and this court found that this police trickery or deception was minimal. *Id.* at 719-20. Likewise, in *People v. Minniti*, 373 Ill. App. 3d 55, 69-71 (2007), the police overstated the evidence against the defendant by falsely stating that they had satellite images showing someone going from the defendant's home to the scene of the crime and that they had DNA evidence matching the defendant from the inside of the victim. This court held

that these deceptions did not rise to the level necessary to overbear the defendant's free will. *Id.* at 72.

¶ 57    Here, as in *In re Marvin M.* and *Minniti*, any deception or misstatement by Cappelluti in downplaying the likelihood of the transfer of defendant's case was but one factor in the totality of the circumstances. Again, while the better answer would have been for Cappelluti to advise defendant that a transfer was automatic if he was charged with first-degree murder, we note that Cappelluti did not go as far as telling defendant that his case would not be transferred. While we disapprove of Cappelluti's response and believe that he could have answered defendant's question more accurately, it was one of many factors in the totality of the circumstances and not sufficient to overcome defendant's will and render his statement involuntary.

¶ 58    Moreover, as the trial court noted, defendant had prior experience with the court system, in that four years before, at age 13, he was charged with attempted murder. The attempted murder case, which was less serious than the instant case, was transferred to adult criminal court, making defendant aware of the increased likelihood that this case would also be transferred.

¶ 59    Turning to Schletz, defendant argues that he failed to protect his rights when Cappelluti misinformed him about the transfer of his case. Defendant is correct that Schletz said nothing when Cappelluti advised defendant that the transfer was "always a possibility." Even so, we have already determined that any deception or misleading by Cappelluti in this regard was but one factor in the totality of the circumstances and that it did not rise to the level of overbearing defendant's will.

¶ 60    Defendant further argues that Schletz failed to take any actions on his behalf during the entire interrogation. According to defendant, Schletz acted as a detective working to secure his statement rather than a concerned adult who was protecting his interests. We note that the trial

court found that Schletz played a "hybrid role" during the questioning of defendant and that his role was not "thoroughly explained." The court acknowledged that Schletz did not ask questions, but it noted that he wrote something down on his hand to assist Cappelluti during the interview.

¶ 61 Our supreme court has stated that there is no requirement that a juvenile officer be present when a minor is questioned and that the absence of one will not render a juvenile's statements *per se* involuntary. *Murdock*, 2012 IL 112362, ¶ 52; *cf. In re G.O.*, 191 Ill. 2d 37, 55 (2000) (noting that, while a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation, such a denial was a factor to consider in determining whether a juvenile's confession was voluntary). In addition, as we explain, our supreme court has found a juvenile's statement to be voluntary even when the juvenile officer completely abandoned his role and acted as a lead investigator.

¶ 62 In *Murdock*, for example, the supreme court determined that the juvenile officer abandoned his role when he began questioning the defendant, a juvenile, about his role in the offense. *Murdock*, 2012 IL 112362, ¶ 51. The court noted that the juvenile officer was not merely standing by while another officer took the lead in interviewing the defendant; the juvenile officer was the lead interviewer. *Id.* Because the juvenile officer could not act as a concerned adult while at the same time compiling evidence against the defendant, the court viewed it as though no juvenile officer were present with the defendant. *Id.* Nevertheless, the court found the defendant's statement voluntary. *Id.* ¶ 55. The court noted that, while the presence of a juvenile officer was a significant factor in the totality-of-the-circumstances argument, there was no requirement that such a person be present and that the defendant was given his *Miranda* rights, properly treated, offered food, given access to restroom facilities, and not physically or mentally threatened. *Id.* ¶ 52.

¶ 63    Here, in contrast to *Murdock*, Schletz never questioned defendant, other than to pose one general question as to his well-being. Rather, Cappelluti acted as the sole interviewer. The one incident of Schletz writing something on his hand and showing it to Cappelluti is a far cry from the situation in *Murdock*, where the juvenile officer abandoned his role by becoming the lead interviewer. In addition, Schletz fulfilled his role as juvenile advocate to the extent that defendant was provided his juvenile *Miranda* rights, properly treated, offered a drink, given access to restroom facilities, and not physically or mentally threatened.

¶ 64    Schletz's role in this case more closely resembles the situation in *People v. Patterson*, 2014 IL 115102, ¶ 53, where the juvenile officer did not ask any questions but fulfilled the fundamental duties of inquiring whether the defendant needed anything, ensuring that he was treated properly while in custody, reading the defendant his *Miranda* rights, and ascertaining that he understood those rights. Though the defendant in *Patterson* argued that the juvenile officer improperly participated in the investigation by helping the investigating officer type the defendant's statement, reading it to the defendant, and obtaining his signature, our supreme court disagreed. *Id.* ¶ 51.

¶ 65    As the *Patterson* court noted, if neither the complete absence of a juvenile officer nor the active, adverse participation of a purported juvenile officer in the questioning of a juvenile (as in *Murdock*) was sufficient to mandate a finding that a statement was not voluntary, then the defendant's argument that the juvenile officer improperly participated in the investigation necessarily failed. *Id.* ¶ 56. Again, we look to the totality of the circumstances in determining whether defendant's statement was voluntary (see *Armstrong*, 395 Ill. App. 3d at 624), and the trial court, despite its finding that Schletz played a hybrid role, still found that defendant's statement was voluntary.

¶ 66    Finally, defendant argues that his personal characteristics require this court to exercise great caution when determining whether his statement was voluntary. Defendant points out that his IQ was measured to be 65 and his formal education ended in sixth grade. However, because this information was elicited at the sentencing hearing and not the suppression hearing, the State argues that it should not be considered.

¶ 67    Our supreme court has distinguished seeking to affirm a trial court's ruling on a motion to suppress from seeking to overturn it. *Murdock*, 2012 IL 112362, ¶¶ 35-36. For example, the *Murdock* court noted that in *People v. Brooks*, 187 Ill. 2d 91 (1999), the defendant relied on evidence elicited at trial, not the suppression hearing, to argue that his motion to suppress was erroneously denied by the trial court. *Murdock*, 2012 IL 112362, ¶ 36. In response to the defendant's argument that the reviewing court could consider evidence introduced at trial as well as at the suppression hearing, the supreme court disagreed, noting that the defendant was seeking not to affirm the trial court's decision but to overturn it. *Id.*

¶ 68    Defendant does not respond to the State's argument in his reply brief, and we decline to consider evidence from defendant's sentencing hearing to overturn the trial court's decision on his motion to suppress. Regarding defendant's ability to understand what transpired at the recorded interview, we note that the court found that defendant was "intelligent" and "understood the questions of the officers." In addition, the court noted that defendant had taken high school classes in the department of corrections for juveniles. Both Cappelluti and Schletz testified that defendant appeared to understand his rights, and defendant had prior experience with the court system. Accordingly, nothing about defendant's personal characteristics affected the voluntariness of his statement.

¶ 69    In sum, the trial court's credibility and factual findings were not against the manifest weight of the evidence. We determine that, under the totality of the circumstances, defendant's statement was voluntary and the trial court properly denied his motion to suppress.

¶ 70                                    B. Sentence

¶ 71    During the initial briefing of this appeal, defendant argued that the trial court abused its discretion by sentencing him to 43 years in prison. On September 4, 2015, we issued a Rule 23 order affirming the judgment. *Walls*, 2015 IL App (2d) 130761-U. Defendant then petitioned for leave to appeal to our supreme court. On March 25, 2020, the supreme court denied defendant's petition but directed us to vacate our judgment. The court further directed us to

> "consider the effect of this Court's opinions in *People v. Buffer*, 2019 IL 122327, and *People v. Holman*, 2017 IL 120655, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460 (2012), and determine if a different result is warranted." *Walls*, No. 119940.

We allowed the parties to file supplemental briefs.

¶ 72    Defendant now contends that his sentence violates the eighth amendment because the trial court imposed a *de facto* life sentence without sufficiently considering the attendant characteristics of defendant's youth and without making the necessary findings. Specifically, defendant maintains that the court "failed to indicate whether it found [his] characteristics as showing 'irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation' " (quoting *Holman*, 2017 IL 120655, ¶ 46). Defendant further proposes that many of his characteristics that were revealed at his sentencing hearing showed a transient

immaturity rather than permanent incorrigibility. Defendant thus requests a new sentencing hearing.

¶ 73 The State responds that defendant did not receive a *de facto* life sentence, so the sentence does not violate the eighth amendment. Notwithstanding that argument, the State submits that (1) the trial court considered defendant's youth and its attendant characteristics and (2) defendant is one of the rare juveniles who deserves a *de facto* life sentence.

¶ 74 The eighth amendment to the United States Constitution, which applies to the states through the fourteenth amendment (*Roper v. Simmons*, 543 U.S. 551, 560 (2005)), prohibits cruel and unusual punishments. Juvenile offenders are given special consideration for purposes of the eighth amendment. For example, unlike adults, juvenile offenders can never be sentenced to death (*id.* at 578) and cannot be sentenced to life without parole for a non-homicide offense (*Graham v. Florida*, 560 U.S. 48, 82 (2010)). In *Roper*, the Court discerned "[t]hree general differences between juveniles under 18 and adults": (1) a lack of maturity and an underdeveloped sense of responsibility, which can lead to impetuous and ill-considered actions and decisions, (2) a higher vulnerability to negative influences and outside pressures, and (3) a character that is less well formed. *Roper*, 543 U.S. at 569-70. The Court explained that even heinous crimes committed by juveniles do not necessarily evidence an "irretrievably depraved character." *Id.* at 570. Further, the Court observed that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573. In *Graham*, the Court added: "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." *Graham*, 560 U.S. at 72-73.

¶ 75    In *Miller*, the Supreme Court held that the eighth amendment prohibits mandatory sentences of life without parole for juveniles who commit murder. *Miller*, 567 U.S. at 465. In so holding, the Court explained:

> "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

Although the Court did not categorically prohibit sentences of life without parole for juvenile homicide offenders, the Court required sentencing judges to consider the offenders' "youth and attendant characteristics" before imposing such penalty. *Id.* at 483. Because juveniles typically have "diminished culpability and heightened capacity for change," the Court envisioned that it would be "uncommon" for circumstances to warrant sentencing a juvenile to life without parole. *Id.* at 479.

¶ 76    The characteristics of youth that the Supreme Court mentioned are sometimes referred to as the *Miller* factors. See *Holman*, 2017 IL 120655, ¶ 41. Section 5-4.5-105 of the Unified Code

of Corrections (730 ILCS 5/5-4.5-105 (West 2018)), which went into effect in 2016, requires courts to consider factors adapted from *Miller* when sentencing juvenile offenders.

¶ 77     *Miller* left important questions unresolved.  One question was whether its holding applies retroactively.  Both the Illinois Supreme Court and the Supreme Court of the United States have now recognized that *Miller* indeed applies retroactively.  *People v. Davis*, 2014 IL 115595, ¶ 34; *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016).  Another question was whether *Miller*'s holding applies to discretionary life sentences.  Our supreme court has answered that question in the affirmative.  *Holman*, 2017 IL 120655, ¶ 40.  Yet another question was whether *Miller*'s holding applied to *de facto* life sentences—*i.e.*, sentences for terms of years that are the functional equivalent of a sentence of life without parole.  In *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10, our supreme court extended *Miller*'s holding to *de facto* life sentences.  In *Buffer*, 2019 IL 122327, ¶ 40, the court clarified that, "[i]n determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years."

¶ 78     Accordingly, under the current legal landscape,

> "[t]o prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27.

¶ 79     Defendant's 43-year prison sentence exceeds the threshold established in *Buffer* and thus constitutes a *de facto* life sentence.  Nevertheless, the State argues that defendant received the functional equivalent of an approximately 37-year sentence, because he was given credit for 2300 days that he spent in custody before he was sentenced.  We reject the State's argument.  The

concern at the heart of *Miller*—locking up juveniles and throwing away the key—is the same whether or not the person spends some of his time in a county jail rather than in prison. We note that the appellate court has repeatedly rejected similar attempts by the State to circumvent *Buffer*'s 40-year threshold by relying on sentencing credits. See, *e.g.*, *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 22 (a juvenile offender's 70-year sentence was a *de facto* life sentence, notwithstanding that he was eligible for day-for-day good conduct credit). Here, defendant is not entitled to any good conduct credit, so the State's argument about the functional equivalency of the sentence is even weaker than the argument that it raised in *Thornton*. Accordingly, defendant was subjected to a discretionary *de facto* life sentence.

¶ 80    The issue thus becomes whether the trial court failed to consider defendant's youth and its attendant characteristics. In *Holman*, our supreme court offered guidance about what that means. Per *Holman*, a court that sentences a juvenile to a life sentence "must consider specifically the characteristics mentioned by the Supreme Court" in *Miller*. *Holman*, 2017 IL 120655, ¶¶ 42-44. To that end:

> "[A] juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer

pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46. Here, defendant was sentenced before the Illinois legislature enacted section 5-4.5-105 of the Unified Code of Corrections. Thus, "any inquiry into the *Miller* factors is backwards-looking" and requires us to "look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.* ¶ 47.

¶ 81     Our recent decision in *People v. Reyes*, 2020 IL App (2d) 180237, is instructive. In *Reyes*, even though the trial court "stated that it considered the *Miller* factors and *** there was also evidence and argument related to those factors," we vacated the defendant's *de facto* life sentence and remanded for a new sentencing hearing. *Id.* ¶ 31. One problem that we mentioned was that the trial court, despite noting the defendant's age, "never commented on the defendant's immaturity, impetuosity, or ability to understand risks and consequences." *Id.* Another problem was that "[t]he trial court did not specifically address whether the defendant was too young or too immature to resist the negative influences surrounding him at the time, or whether he was mature enough to maintain control over his actions." *Id.* Furthermore, the trial court did not discuss (1) "the finding in the [presentence investigation (PSI)] report that the defendant was at a medium risk to reoffend," (2) the fact that the defendant earned certificates in prison, or (3) that the defendant expressed remorse. *Id.* Nor did the record "show that the trial court made any determination that the defendant was beyond rehabilitation or that the defendant's conduct reflected permanent incorrigibility." *Id.* Under those circumstances, we concluded that the trial court improperly imposed a *de facto* life sentence on the defendant without determining whether he was "among the rarest of juvenile offenders whose 'conduct showed irretrievable depravity,

permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *Id.* ¶ 32 (quoting *Holman*, 2017 IL 120655, ¶ 46).

¶ 82   Here, the trial court had evidence before it relating to the *Miller* factors, and the court considered defendant's chronological age at the time of the offense. That, however, is not enough to comply with *Miller*'s mandate. See *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 24 ("[M]ere awareness of a defendant's age and consideration of a PSI does not provide evidence that the circuit court specifically considered defendant's youth and its attendant characteristics."). As in *Reyes*, the court here did not explicitly determine that defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. See also *People v. Figueroa*, 2020 IL App (1st) 172390, ¶ 37 (where the attorneys discussed the defendant's prospects for rehabilitation but the court did not assess those prospects when explaining its ruling, the sentencing hearing did not comply with *Miller*'s mandate). The court here also did not comment on defendant's intellectual limitations, which were documented in the PSI.

¶ 83   We recognize that even though the trial court did not use these precise words when sentencing an offender, a reviewing court may infer from the trial court's comments that the trial court determined that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. In *People v. Walker*, 2018 IL App (3d) 140723-B, ¶ 34, for example, the appellate court interpreted the following comments by the trial court as evincing an opinion that the defendant showed no potential for rehabilitation: he " 'would kill for the joy of it and seriously does not care at all about a human life[;] it makes no difference to him whatsoever.' " See also *Holman*, 2017 IL 120655, ¶¶ 17, 50 (the defendant's original sentencing hearing passed constitutional muster where the

defendant presented no mitigating evidence, there was significant evidence regarding aggravating factors, and the trial court concluded that the defendant " 'cannot be rehabilitated' "). Here, however, the trial court's comments at defendant's sentencing hearing do not reflect an explicit or implied determination that defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.

¶ 84 The trial court expressed mixed feelings about defendant's maturity at the time of the offense, telling him:

> "I can't get around the fact that you were 16 years old at the time that this happened. In some ways, you were an incredibly adult 16-year-old. In some ways, you have a lot of growing up to do. But I find your being 16 mitigatory."

Given that the court believed that defendant had "a lot of growing up to do," it is not evident that the court determined that defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.

¶ 85 Furthermore, when announcing defendant's sentence, the court stated that it "considered all the statutory and non-statutory factors in aggravation and mitigation *as well as the constitutional command to fashion a sentence that facilitates the defendant's rehabilitative potential* and restores them to useful citizenship." (Emphasis added.) With this comment, the trial court arguably implied that defendant possessed at least some rehabilitative potential. Under the law as it presently stands, if the court believed that defendant had rehabilitative potential, it could not sentence him to a prison term exceeding 40 years. See *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 48 (a trial court's express finding that a defendant has rehabilitative potential "contravenes any conclusion defendant was permanently incorrigible or irretrievably depraved and

is, therefore, unconstitutionally at odds with a *de facto* life sentence without parole for a juvenile offender").

¶ 86    We also deem it significant that the trial court found that defendant might not have intended to commit murder and that he acted at the encouragement of another individual:

> "The law tells me to look at whether your criminal conduct was induced or facilitated by someone other than yourself.  I find that it was.  To the extent there was clear evidence on this, it suggests that Mr. Hearton was involved and encouraging you to commit this offense, or at least an offense.
>
> It's possible that you set out intending to kill Mr. Allison that day.  It's equally, if not more possible, you didn't.  It doesn't really matter too much.  It's equally possible that you had absolutely no intent that anybody would get shot that day.  But that's what felony murder is.  Someone goes to commit an offense, a felony, and someone dies.  And at a minimum, that's what happened in this case."[2]

If defendant did not intend to commit murder and his crime was induced or facilitated by another person, it is not a foregone conclusion that the trial court determined that defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.

---

[2] As previously mentioned, defendant was found guilty of murder in that he knew that his acts created a strong probability of death or great bodily harm.  720 ILCS 5/9-1(a)(2) (West 2006). He was not found guilty of felony murder.  See 720 ILCS 5/9-1(a)(3) (West 2006).  We interpret the trial court as commenting here that defendant's conduct, at a minimum, constituted felony murder, even though the jury found him guilty of murder pursuant to a higher mental state.

¶ 87 Additionally, although the trial court was unable to conclude that defendant's criminal conduct was the result of circumstances that were unlikely to recur, the court recognized that defendant was a byproduct of his horrific upbringing. The court said:

"I believe you have grown up in jail. But I also believe that based upon circumstances beyond your control, your view on life is awfully violent. I hope circumstances like this would never happen again, but I can't say that they wouldn't."

Elsewhere in its ruling, the court likened defendant's background to a Charles Dickens tragedy, commenting that defendant was "left without all of those things that humanity provides to raise its young." Even so, the court believed that defendant was now in a stronger position in life by virtue of having the support of his family members, who testified on his behalf at the sentencing hearing:

"Also, mitigatory, or in your favor, I find, we talked about it before, the many hardships you had growing up, though it does not excuse the violence that you've engaged in. And at the same time, today, you're blessed with family and friends who will be here for you. That's actually important in court because a person who has the support of friends and family is more likely to do well in life than someone who doesn't. You proved that. You didn't have that blessing growing up, and it led to some problems. You do have it now which is in your favor."

The trial court thus recognized that defendant, at the time of sentencing, had a support network that he lacked at the time of the offense. Such comments further support our reluctance to infer that the trial court determined that defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.

¶ 88 Despite the fact that the trial court never explicitly made the determination that is required by *Holman* and despite the fact that such determination cannot be inferred from the trial court's

comments, the State insists that defendant deserved a *de facto* life sentence. It is for the trial court, not this court, to make that determination. See *Holman*, 2017 IL 120655, ¶ 46 ("Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the *trial court* determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.") (emphasis added). We note that the case law has evolved significantly since the trial court sentenced defendant.

¶ 89   We vacate defendant's sentence and remand for a new sentencing hearing, at which defendant is entitled to be sentenced in accordance with section 5-4.5-105 of the Unified Code of Corrections. *Buffer*, 2019 IL 122327, ¶ 47. We express no view about what sentence would be appropriate, and we do not foreclose the trial court from imposing a *de facto* life sentence again. We reiterate, however, that the trial court may impose a *de facto* life sentence only if it makes a determination that is consistent with *Holman*.

¶ 90                                    III. CONCLUSION

¶ 91   For the aforementioned reasons, we affirm defendant's conviction. We vacate defendant's sentence and remand for resentencing.

¶ 92   Affirmed in part and vacated in part.

¶ 93   Cause remanded.

**No. 2-13-0761**

| | |
|---|---|
| **Cite as:** | *People v. Walls*, 2020 IL App (2d) 130761-B |
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 07-CF-1151; the Hon. Fred Foreman and the Hon. Daniel B. Shanes, Judges, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Jeffrey Bruce Kirkham, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |