2021 IL App (2d) 180037-U
No. 2-18-0037
Order filed February 1, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 95-CF-573 |
| JOSEPH ARRIETA, | ) ) | Honorable George J. Bakalis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: Juvenile defendant's natural life sentence did not violate the eighth amendment of the United States Constitution nor the proportionate penalties clause of the Illinois Constitution. In addition, the trial court did not abuse its discretion in denying defendant's motion for expert witness funding or in considering testimony of defendant's gang affiliation in its sentencing decision. Therefore, we affirm.

¶ 2    At issue in this appeal is whether the trial court erred when it resentenced defendant, Joseph Arrieta, to natural life in prison. Defendant argues that the trial court erred in sentencing him because (1) his sentence was unconstitutional under the United States Constitution and Illinois Constitution, (2) the trial court abused its discretion in denying his motion for expert witness

funding, and (3) the trial court abused its discretion when it considered unreliable allegations in its sentencing determination. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4     On April 13, 1995, defendant was charged by information with ten counts of first-degree murder (720 ILCS 5/9-1(a) (West 1994)) for the fatal shootings on March 15, 1995, of Anthony Moore and Edward Riola. He was also charged with one count of aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 1994)) for knowingly detaining Brandy Benson against her will while in possession of a handgun. At the time of the shootings, defendant was 17 years old.[1]

¶ 5     Following a jury trial, the jury found defendant guilty of first-degree murder of both Moore and Riola and guilty of aggravated unlawful restraint of Benson. The trial court sentenced him to life imprisonment. At the time of the shootings, section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1994)) made life imprisonment mandatory for defendants who were 17 years old or older at the time of the commission of the offense and were found guilty of murdering more than one victim. We affirmed his conviction and summarized the relevant trial proceedings on defendant's direct appeal. *People v. Arrieta*, No. 2-96-0293 (1997) (unpublished order under Illinois Supreme Court Rule 23). A summary of the shootings is recounted *infra* ¶¶ 11-15.

¶ 6     Following defendant's direct appeal, he appealed several more times between 1997 and 2011, and in each appeal, we affirmed the trial court judgment. See *People v. Arrieta*, No. 2-97-1313 (1998) (unpublished order under Illinois Supreme Court Rule 23) (affirming order dismissing defendant's petition for postconviction relief); *People v. Arrieta*, No. 2-01-0492 (2002) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (affirming order dismissing

_____

[1] Defendant was born June 28, 1977.

defendant's second postconviction petition); *People v. Arrieta*, No. 2-06-0639 (2008) (unpublished order under Illinois Supreme Court Rule 23) (affirming order denying defendant's petition for leave to file his third successive postconviction petition); *People v. Arrieta*, 2011 IL App (2d) 100382-U (affirming order denying defendant's petition to vacate his sentence).

¶ 7 On August 28, 2012, defendant petitioned for relief from judgment based on *Miller v. Alabama*, 567 U.S. 460 (2012), arguing that his mandatory life sentence was unconstitutional because he committed the murders before turning 18 years old. The trial court granted defendant's section 2-1401 petition, vacating his sentence and ordering a new sentencing hearing. We affirmed. *People v. Arrieta*, 2014 IL App (2d) 130035-U, ¶ 29.

¶ 8 On September 27, 2016, defendant moved to request funds for an expert witness. He sought assistance for funding to hire a mitigation specialist to present testimony regarding mitigating factors. He argued that he had been in prison for 20 years and had largely lost contact with potential mitigating witnesses, and therefore expert testimony was necessary at his resentencing hearing.

¶ 9 At a January 24, 2017, hearing, defense counsel explained that defendant was seeking an expert to testify to "rehabilitation specifically." Counsel stated that experts can be expensive, but she could not provide the trial court an overall cost because she had not "found anyone concrete." The trial court responded that, in terms of defendant's rehabilitative potential, that was "based on the facts and circumstances, number one, of the case itself; and number two, what has he done in the Department of Corrections." It did not believe any psychiatrist could explain that to the court. Accordingly, the trial court denied defendant's motion for expert witness funds.

¶ 10 A. New Sentencing Hearing

¶ 11 Defendant's new sentencing hearing commenced on August 8, 2017. The State's first witness was Roger Nott, a police officer with the Village of Glendale Heights. He testified as

follows. He was the first detective dispatched in response to a 911 report of a shooting on March 15, 1995. Riola was the 911 caller, and Nott could also hear two responding officers, Mineo and Zeisig, asking questions in the background of the call. Riola indicated that the shooter was "Joe," a friend of his roommate, and then identified him as "Joe the Mexican."

¶ 12    At the scene of the crime, Nott located Moore and Riola. When the officers had first arrived, Moore was deceased but Riola was still conscious and able to respond to questions. Riola was taken by ambulance to the hospital, where he ultimately succumbed to his wounds.

¶ 13    Nott and the police attempted to locate the "Joe" individual identified by Riola. The Kendall County Sheriff's Office had received a call from a Brandy Benson saying that she had witnessed the murders of Riola and Moore. After Benson was brought back to the police department, Nott and Mineo interviewed her.

¶ 14    Benson told Nott that she was a friend of Moore and had been invited to Moore and Riola's house that last night. At their house, they drank beer and played cards. Around 10 p.m., three persons arrived who were ultimately identified as defendant, Danny Garcia, and Donna Hernandez. At one point, defendant followed Moore into his bedroom. Sometime thereafter, Benson heard several "pops," and she and Riola got up and ran toward Moore's bedroom. She saw defendant come out of the bedroom, and he shot Riola in the chest. Benson turned around and ran back to the front room. Defendant followed her and started threatening to kill her. He told her his name was "A-Town" and that he was a Latin King, and he told her to repeat that while pointing his gun at her.

¶ 15    Defendant pointed the gun at Hernandez and Garcia too. He said that he should probably kill everybody. He told Garcia to get his crutches from the bedroom, but Garcia returned from the room without his crutches. He told defendant that someone was still moving in the bedroom, and

defendant returned to the bedroom to retrieve his crutches. Defendant told them that he shot Moore and Riola because they crossed him in some type of deal. Defendant then made Benson carry his crutches out to the car.

¶ 16    Defendant ordered her into the Chevy Blazer, and he drove off with Benson, Garcia, and Hernandez in the vehicle. They discussed what to tell the police because they had left a vehicle behind in Moore and Riola's driveway. Defendant told Benson to tell the police a story that included three Mexicans coming by the house and then later three Black males, one of whom drove Benson home. Defendant had Hernandez obtain Benson's information, including her home address and phone number, to deter her from talking to the police. They drove to a hill on Route 25 in Aurora, where they stopped the car and defendant had Hernandez wipe down the bullets from his gun.

¶ 17    Defendant then exited the vehicle and discussed with Garcia and Hernandez whether he should kill Benson. Hernandez and Garcia told him he should not. Benson feared that she was going to die. Everyone got back in the vehicle, and they began to drive again. Somewhere on Route 25, defendant stopped the vehicle and told Hernandez and Garcia to get out and walk. Only Benson remained in the car with defendant, who discussed his story about three Mexicans and three Black men coming to Riola and Moore's house. Eventually, defendant let Benson go, and she went to a friend's house and told her friend and her friend's mother what had happened.

¶ 18    Based on this interview with Benson, Nott was able to identify and locate Hernandez, Garcia, and defendant. Garcia's statements and eventual trial testimony corroborated Benson's account.

¶ 19    Nott also reviewed the autopsy reports for Moore and Riola. The reports indicated that both died of multiple gunshot wounds: Riola was shot three times, and Moore was shot six times.

Evidence supported that Moore was shot an additional time while lying on his back on the floor, which occurred after defendant returned to the bedroom to retrieve his crutches and found that Moore was still alive.

¶ 20    Lieutenant Mark Weeks testified next as follows. He was a police officer with the City of Aurora, and he had been dispatched to a February 1, 1994, assault incident in Aurora. The complainant was Esquivel Raynaldo, who claimed that while he was walking out of a grocery store, defendant confronted him, displayed a knife, and threatened him with the knife. Raynaldo kicked defendant in the groin, and a physical altercation ensued. As a result, defendant was referred to the juvenile court system for aggravated assault.

¶ 21    Weeks responded to another incident on March 28, 1994, for shots fired. The victim was Jode Granados, who told officers that he had been at a car wash when he saw defendant arrive in his vehicle. Granados had had problems with defendant, and so he drove out of the car wash lot. Defendant followed him, pulled alongside his car, displayed a handgun, and pointed it at him. Granados ducked and then heard several shots fired. There were two other individuals in Granados' car at the time, and their accounts to officers were consistent with Granados'. Granados and one other witness identified defendant as the shooter. Evidence technicians found a bullet hole in the door frame of Granados' car between the driver's window and rear passenger window, and the rear window had been shattered. They recovered a projectile from the backrest of the front driver's side seat. Defendant was again referred to the juvenile court system. He was 16 years old at the time of both incidents that Weeks described.

¶ 22    David Bayer testified as follows. In 1995, he was with the Du Page County State's Attorney's Office, assigned to the felony courtroom. He was approached by an inmate, Tracey Mitchell, with respect to defendant, who at the time was Mitchell's fellow inmate. Mitchell

indicated that defendant wanted to have witnesses against him killed. Bayer called the detective division at the Du Page County Sheriff's Office, and they set up a meeting to interview Mitchell. Following the interview, detectives prepared an affidavit for an order of eavesdrop, which was approved. Detectives made eavesdrop attempts, but no charges against defendant ever came out of the eavesdrop attempts.

¶ 23    Following Bayer's testimony, the State offered several victim impact statements. The impact statements were from Christopher Moore, who was Anthony Moore's brother; Sheila Kuhlemeyer, Anthony Moore's mother; Jacob B., Anthony Moore's son; Kristen B., the mother of Jacob B.; and Bob Riola, Edward Riola's brother.

¶ 24    The State's final witness was Joel Starkey, who testified as follows. He was employed with the Illinois Department of Corrections (IDOC) at the Stateville Correctional Center as the chief investigator. At IDOC, he had previously been a facility investigator and institutional coordinator for the intelligence unit at Pontiac, and a district coordinator. As part of his duties working for IDOC, he was involved in identifying gang members. There were currently over 30 gangs identified in IDOC.

¶ 25    Starkey reviewed defendant's disciplinary actions and security threat group reports. Defendant had been issued seven tickets, *i.e.*, disciplinary reports, while in IDOC. All seven tickets were deemed major infractions, although two were later expunged. The first ticket identified was from March 5, 2002, when defendant along with 30 other inmates refused to leave the yard after yard time was over, effectively stating an organized sit-in. The inmates refused to leave in response to a new rule to pair up all inmates during line movement. Defendant was cited for unauthorized organizational activity, disobeying a direct order, a violation of rules, and dangerous disturbance.

¶ 26    The next ticket was from September 27, 2008. When defendant's cellmate returned to his cell, defendant was found holding a laundry bag with a metal object inside it. Defendant told the officer that if his cellmate was going to be placed in that cell, he was going to kill him. Defendant and his cellmate got into an altercation, and defendant shattered his cellmate's television on the floor. Correction officers had to separate the two men. Defendant was cited for dangerous contraband, dangerous misuse of property, and intimidation and threats.

¶ 27    Two days later, defendant received another ticket for sending a counselor a letter that stated:

> "I want to thank you, Mr. Bass, and the rest of the asshole staff. I can do whatever I want now, I got shit to lose, and I'm hoping you kind of feel responsible for not doing more to help me to avoid this bullshit. My only regret is I didn't get to bash that bitch-ass celly of mine's skull in how I wanted to."

Defendant was issued violations for intimidation and threats, dangerous communications, insolence, and violation of rules.

¶ 28    On November 8, 2013, defendant handed a mental health professional a 12-page handwritten letter, wherein he wrote: "[P]lease forgive me if my thoughts were in the wrong place, but I must say I completely dig the purple nails, it is one of my favorite colors. I said to myself I let her—I bet her feet are just pretty. [smiley face] I thought it was just so cute how you were fighting with your hair tie. Oh, my God, I can't believe I just said those things." The mental health professional had previously warned defendant about the appropriate boundaries of a therapy relationship. Defendant was cited for insolence and abuse of privileges.

¶ 29    Finally, on January 18, 2015, staff found an altered extension cord in defendant's cell. The cord could be used to heat water, and staff members had previously been assaulted with boiling hot water or baby oil. Defendant was cited for damage and misuse of property.

¶ 30    Starkey explained that, broadly speaking there were two large groups of gangs in IDOC: the People and the Folk. He had identified defendant as a gang member in IDOC, including via defendant's own admission, specifically as a Spanish Gangster Disciple, which was under the umbrella of the Latin Folk. Over objection, the trial court allowed testimony that a gang roster recovered in prison identified defendant by his nickname, "Beast," as a member of the Spanish Gangster Disciples. Another internal memo regarding IDOC gang activity contained the statement of a confidential informant that defendant was known as Beast and had been given a leadership position with the Latin Folks.

¶ 31    Starkey also described an IDOC intelligence unit's observation, via monitoring cameras in the Stateville gymnasium, that eight inmates had formed a circle and exercised together. All eight, including defendant, were identified as Latin Folk. There was a hierarchy among the eight, and defendant appeared to be second highest in the hierarchy.

¶ 32    Starkey next summarized a March 2013 report, wherein a confidential informant stated that defendant had ordered an assault on another Latin Folk member. Another confidential informant report made shortly thereafter identified defendant as the Edward House building coordinator, which meant he was in charge of all the Latin Folk in that unit at the time. As the gang's building coordinator, he would have had knowledge of inmate and staff assaults or any criminal activity going on in the cell house. Of the approximately 200 inmates at Stateville, around 30 to 40 were affiliated with the Latin Folk and were therefore under defendant's leadership.

¶ 33    Defense counsel objected to the last two reports based on them being almost entirely redacted. The trial court stated it understood the redactions were for the protection of the confidential informant. Counsel responded that there was no ability to question or test the veracity of the informant's statements. The trial court said counsel could question the witness about the reports and allowed the questioning to continue.

¶ 34    Starkey testified that defendant was also placed in administrative detention from July 2013 to December 2015. Administrative detention was a non-disciplinary confinement for offenders that were a "management issue." The offender would be removed from the general prison population and sent to a different facility in Illinois. While there were approximately 40,000 inmates in IDOC, less than 150 were placed in administrative detention.

¶ 35    Defendant was placed in administrative detention in response to three violent staff assaults carried out by Latin Folk at both the Menard and Stateville locations. Any inmate identified as being in a leadership role with the Latin Folk was placed in administrative detention, and this included defendant. Starkey opined that, based on his experience and review of defendant's file, he believed defendant was an active gang member within IDOC for the Spanish Gangster Disciples and an active leader for the Latin Folks. Starkey admitted that he never spoke with defendant personally, and he did not have knowledge of when the last time defendant was asked about his gang affiliation.

¶ 36    The trial court then examined Starkey. It asked him how he judged the veracity of the confidential informants whom he had relied on in establishing that defendant was in a leadership position with the Latin Folk. Starkey could not answer with respect to the particular informants used here, but he answered generally that IDOC used both confidential sources and confidential informants. Confidential sources were typically one-time sources, whereas confidential informants

took years to cultivate. To become a confidential informant and receive an informant number, the individual had to consistently show high reliability in the information that they provided.

¶ 37 The defense then called its witnesses. Karen Rabideau testified as follows. She was a correctional counselor, and she had been assigned to defendant. She saw him four or five times a week from 2007 to 2009. The majority of what defendant spoke about was trying to get into different programs and job assignments, including wanting to get into different educational classes offered at the facility. She stated that "for the 99 percent of the time he was, you know, polite and respectful to me." She had had only one disciplinary incident with him, when she wrote a ticket in response to one of defendant's letters to her and Counselor Bass about not being removed from his cell—an apparent reference to defendant's September 29, 2008, letter. Defendant wrote an apology letter afterward. She never directly felt in danger because of defendant, and she agreed that defendant was a model prisoner during the time she knew him.

¶ 38 Steven Rodriguez, defendant's older brother, testified as follows. He was 47, about 7 years older than defendant. Rodriguez and defendant grew up in the same household in Aurora, in "pretty much [] the worst neighborhood." As kids, they hung out in the street and looked up to the older guys who were gang bangers. Some of their heroes were pimps. "That's how it was ***. You learn about sex from the older guys, you learned about how to hustle." By "hustle" he meant things like selling drugs and breaking into cars.

¶ 39 Rodriguez believed there were several incidents in defendant's life that affected him. He believed that defendant had separation anxiety when Rodriguez went to a youth home for around two years. He also noted that one of defendant's friends had been hit by a car, which was an unsolved murder, and defendant's dad had been deported when defendant was around 10 years old. Afterward, defendant wanted to hang out more with him and his brother, but he did not allow

it. Rodriguez and his brother had been in two different gangs. Rodriguez had been an Insane Deuce, and his brother was a Latin King. At the time, the two gangs were friendly, but now they were rivals. Rodriguez and his brother both decided to keep defendant from the gangs because "they wanted better for him." He admitted they were not successful in keeping defendant away from gang life.

¶ 40     When defendant was around 10 years old, he developed Perthes disease, which affected his hip bone. He was confined to a wheelchair after spending months in the hospital. Other children made fun of defendant for his condition. Rodriguez did not know if defendant took the teasing to heart, but he did know it was hard for defendant to be sitting in a wheelchair while everyone else went about their business normally.

¶ 41     Rodriguez acknowledged that he had been incarcerated for drug possession. When defendant went to jail, Rodriguez "knew he had to turn cold." It was a "whole different environment" in prison: it was survival. He had seen normal people with executive jobs enter prison for DUIs for six months to a year who became "different people in there."

¶ 42     Defendant was "very angry" when he first went to prison. Today, though, Rodriguez described defendant as more mature. He had had "22 years to contemplate, to grow up." He could sense patience and calmness in defendant. He was like the family counselor now. He spoke with defendant about twice a week, and he believed defendant was helping a lot of his fellow inmates. Defendant also had been studying, including going to the library as often as he could. He read a lot. However, because he was on a life sentence, he was not able to take educational services towards obtaining his GED. He used to go to church, but he stopped going because when you go to church, "they think you're having a gang meeting." Rodriguez never asked defendant whether

he was in a gang, but he did not believe he was in a gang. If defendant were, Rodriguez said he would have heard something.

¶ 43　　Rodriguez believed that defendant would want to make the most of a second chance. Rodriguez had a friend who worked in civil rights litigation who offered to have defendant work towards becoming a paralegal. Defendant would also have a support system outside of prison, with him, his sister, and others providing a positive environment.

¶ 44　　Finally, defendant made a statement to the court. Defendant, addressing the families of Moore and Riola, stated he was "truly sorry for what I have done." Addressing the judge directly, defendant said he took full responsibility for his actions. Defendant claimed that he had witnessed domestic violence from a young age, including his mother stab his father, and he emphasized the toll of being bound to a wheelchair. Even after several surgeries, when he was able to walk again, it was not the same. The deportation of his father "crushed" him and destroyed the support that he needed to prevent the path he eventually took. He also alleged that his fifth-grade teacher had sexually molested him.

¶ 45　　Defendant acknowledged his "share of trouble" in prison, including months in segregation, but he believed he had grown. He claimed he never hurt anyone in prison, and he stated that he had goals to become a paralegal and eventually a physical therapist. He implored the court for mercy.

¶ 46　　　　　　　　　　　　B. Sentencing Decision

¶ 47　　On October 10, 2017, the trial court issued its memorandum opinion and sentenced defendant to natural life imprisonment. The trial court explained its decision as follows. Following the Supreme Court's decision in *Miller*, 567 U.S. 460, mandatory sentences of natural life for those under the age of 18 at the time of their crimes violated the eighth amendment's prohibition on

cruel and unusual punishments. Nevertheless, natural life sentences were not prohibited but could be imposed following a complete sentencing hearing. Accordingly, the trial court disagreed with defendant that only a sentence between 20 and 60 years was applicable.

¶ 48    Guided by the mitigating factors listed in section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2016)), the trial court examined both defendant's actions in committing the murders and his potential for rehabilitation. It considered the facts from defendant's trial, defendant's life and conduct prior to the offenses and immediately thereafter, the pre-sentence report prepared at defendant's initial sentencing as well as the updated pre-sentence report before the current hearing, and defendant's history while in IDOC.

¶ 49    The first factor that the trial court considered was defendant's age, impetuosity, and level of maturity at the time of the offense, including his ability to consider the risks and consequences of his behavior and the presence of a cognitive or developmental disability, if any. It noted that defendant was within three months of his eighteenth birthday at the time of the shootings. As to defendant's impetuosity, the trial court determined that defendant's killings of Moore and Riola were not impetuous but were planned and discussed by him beforehand. It cited evidence from defendant's trial that defendant told Garcia that Moore had some money and a gun and that he wanted to rip him off. Defendant told Garcia he intended to take Moore's gun from him and shoot Moore and Riola. Regarding defendant's consideration of the risks and consequences of his actions, the trial court noted that defendant had a prior juvenile conviction for burglary and should have realized that the commission of crimes carried consequences. Turning lastly to any possible cognitive and developmental disabilities, the trial court noted that defendant had a full psychological evaluation performed in 1988 that revealed an I.Q. score of 91, which was average, and no major psychological issues. Defendant suffered from Perthes disease, which had required

several surgeries between 1986 and 1991 and required him to use crutches. Prior to defendant's initial pre-sentence report, he had not had any education in 18 months and never received his GED.

¶ 50    The second factor was whether defendant was subjected to outside pressure, including peer or familial pressure. The trial court noted there was no indication that defendant committed the offenses due to any peer or familial pressure. There was some evidence that he had been exposed to prior negative influences, and his older brother had been a gang member and drug dealer.

¶ 51    The third factor was defendant's family, home environment, and educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma. The trial court explained that defendant had a close relationship with his father, who was deported from the United States when defendant was around 11 years old. His father's deportation had a "somewhat devastating effect" on defendant. Defendant described his mother as the most loving mother a son could have, although he also had said that he "ran all over her" when he was young. Defendant's older brother, Rodriguez, had been a gang member and a father figure. Rodriguez testified that he had attempted to persuade defendant to be involved in proper activities, but defendant looked up to gang members. There was no evidence of parental neglect aside from his father's deportation, and no evidence of physical abuse or childhood trauma other than defendant's Perthes disease.

¶ 52    The fourth factor was defendant's potential for rehabilitation and/or evidence of rehabilitation. The trial court described the evidence regarding defendant's potential for rehabilitation as "mixed." On the one hand, while in prison, defendant had earned a language arts achievement certificate, a certificate of excellence for passing the math power book, a social studies achievement certificate, and a science achievement certificate. He had been promoted to

pre-GED classes. Rodriguez testified that since defendant's incarceration, defendant seemed more mature, calm, and patient, and he would have a support system if released.

¶ 53    On the other hand, the court stated that the State had "presented a great deal of evidence which would call into question whether defendant had ever shown rehabilitative potential." Starkey testified that defendant had received five tickets for disciplinary reports in IDOC, which were considered major infractions. His infractions between 2002 and 2015 included citations for disobeying a direct order; being involved in unauthorized organization activity; having dangerous contraband, including a metal object in a laundry bag; damage or misuse of property, including the shattering of a cell mate's television; and intimidation or threats, including a threat to kill a cell mate in September 2008. A couple days after threatening to kill his cell mate, defendant was cited for an improper letter to a counselor wherein he stated that he would do what he wanted and that his only regret was not bashing in his cellmate's head. He was also cited for improper statements to a counselor in 2013, and in January 2015, a report was filed because defendant had an extension cord in his cell, which could be used in an assault.

¶ 54    In addition, the court cited evidence from the sentencing hearing that indicated that defendant was an active member of the Latin Folk street gang and was listed as the building coordinator for the gang. Based on his status as a gang leader, defendant received an administrative detention from July 2013 to December 2015, where he was removed from the general prison population. Starkey admitted there was no evidence of any actual violent activity by defendant while incarcerated.

¶ 55    The fifth factor was the circumstances of the offense. The trial court noted that the killing of Riola and Moore had already been described at length.

¶ 56     The sixth factor was defendant's degree of participation and specific role in the offense. Here, defendant was the sole participant in the commission of the offenses. The trial court noted that he was not influenced by anyone else nor pressured to commit the offenses. He planned the offenses and committed them himself, going to the location with a specific intent to kill Moore and Riola. The trial court mentioned the nature of the killings as an aggravating factor, explaining that the autopsy reports indicated that Moore was shot six times, and Riola was shot three times, once at very close range. The evidence showed that, after surviving the initial shots, defendant was informed that Moore was still alive, and he returned to Moore's room for a final shot to ensure his death.

¶ 57     The court also found significant that, after defendant was arrested, an inmate at Du Page County Jail contacted the Du Page County State's Attorney's office to claim that defendant had made a request to kill a witness against defendant in his pending case. A state's attorney met with the inmate, who said that defendant had several conversations about wanting to have witnesses killed, with the parties discussing a price for the killings in either cash or drugs. Defendant named specific witnesses and gave the inmate a contact person outside of prison. The State sought and received an application of eavesdrop, although the State was never able to effectuate an eavesdrop and nothing resulted from the conversation the inmate described. The trial court found that these facts indicated that defendant was not acting in an irrational or impetuous manner but had given consideration and thought to the consequences of his actions.

¶ 58     The seventh factor was whether defendant was able to meaningfully participate in his defense. The court found no evidence otherwise.

¶ 59     The eighth factor was defendant's prior juvenile or criminal history. The trial court cited defendant's burglary conviction from October 1993. It also cited a juvenile petition from April

1994 alleging aggravated assault and aggravated discharge of a firearm. The State had introduced evidence about the April 1994 petition, including evidence that witnesses saw defendant enter a car wash on March 28, 1994. Defendant followed the victim in his car, and he fired shots at the victim's car. Defendant's shots struck the victim's door frame and shattered one of their car windows. Defendant was 16 years old at the time. This incident indicated to the trial court that although defendant had prior police contact and was involved in serious offenses, it had not made an impression on him.

¶ 60    The trial court also considered that defendant read a statement at his new sentencing hearing wherein he expressed remorse for the killings of Moore and Riola.

¶ 61    In reaching its decision, the trial court stated that juveniles have a lack of maturity and an undeveloped sense of responsibility; they are more vulnerable to negative influences and outside pressures; they have limited control over their own environment; and their character is not as well formed as an adult's, their traits are less fixed, and their actions are less likely to be evidence of irretrievable depravity. The trial court acknowledged that defendant had "somewhat of an unsettled family life," with his father being deported and his brother involved in gang activity. Nevertheless, the evidence showed that defendant was not unable to extricate himself from negative influences but instead chose to be involved with criminal activity. His actions were not the result of outside pressure nor the result of impulsivity or heedless risk taking.

¶ 62    Moreover, the trial court noted that defendant's conduct while incarcerated had "been less than that of a model prisoner" and that "[t]he evidence [was] not particularly strong that his years in the penitentiary to date have corrected or reformed his conduct." It stated that it had considered both his prospects for rehabilitation at the time of his original sentence and while in IDOC. Further,

it could not ignore the seriousness of his offenses, killing two people without provocation within three months of his eighteenth birthday.

¶ 63    Having considered all the aforementioned factors and reviewing the relevant case law, the trial court concluded that its original sentence of natural life imprisonment was correct. Accordingly, it denied defendant's request to be sentenced to less than natural life.

¶ 64    Defendant moved to reconsider and reduce his sentence on November 9, 2017. He argued that his natural life sentence violated the proportionate penalties clause of the Illinois Constitution, violated the principles articulated by the Supreme Court in *Miller*, was based on an improper calculation of the sentencing range, and improperly relied on unreliable allegations from Starkey. On January 11, 2018, the trial court denied defendant's motion to reconsider.

¶ 65    Defendant timely appealed.

¶ 66                                II. ANALYSIS

¶ 67    Defendant raises three issues: (1) whether his natural life sentence violated the eighth amendment of the United States Constitution or the proportionate penalties clause of the Illinois Constitution; (2) whether the trial court erred in denying his motion requesting funds for an expert witness to testify to his rehabilitative capacity at his new sentencing hearing; and (3) whether, in sentencing defendant, the trial court erred in relying on unreliable allegations of his gang membership in prison. We address each argument in turn.

¶ 68                    A. Constitutionality of Defendant's Sentence

¶ 69    Defendant argues that his natural life sentence should be reversed and this case remanded for a new sentencing hearing because his natural life sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Defendant contends that "conspicuously absent" from the trial court's decision was any finding

that defendant exhibited irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation necessary to make his life sentence constitutionally sound.

¶ 70    Defendant argues that, first and foremost, he demonstrated both his actual rehabilitation and his capacity to rehabilitate. Defendant characterizes the trial court's analysis of his rehabilitative potential as "alarmingly brief." He points to the trial court's statement that the evidence of rehabilitation was mixed, arguing therefore that there was at least some evidence of potential rehabilitation precluding a finding of incorrigibility. Defendant also asserts that the trial court's assessment of his potential for rehabilitation had to be forward looking but instead was a backward-focused review of his criminal history, giving only superficial consideration to defendant's youth and proven capacity for rehabilitation.

¶ 71    As evidence of his rehabilitative potential, defendant argues that he took basic adult education courses in prison, and he cites his certificates of achievement in language arts, math, science, and social studies. While he did not obtain a GED, he asserts that he had been prevented from taking the necessary classes due to his life sentence because he had to wait for all other inmates on the waitlist for a class to be exhausted before he could take the class.

¶ 72    Defendant also cites the testimony of Rabideau and Rodriguez as evidence of his rehabilitation. Rabideau, as his counselor for two years, described him as respectful and polite. She acknowledged one disciplinary incident, for an inappropriate letter on September 29, 2008, although defendant later wrote an apology letter. Rodriguez acknowledged that defendant was very angry when he went to prison but testified that he had since calmed and matured. He also testified that a friend could offer defendant a job as a paralegal if he were released. Furthermore, defendant offered his own statement to the court in which he apologized to the families' of Riola and Moore.

¶ 73    Next, defendant argues that the trial court misapprehended several statutory mitigating factors, including dismissing the impact of defendant's physical problems and minimizing the impact of his childhood trauma. Defendant emphasizes the impact of his Perthes disease, which affected the use of his legs and required the use of first a wheelchair and then crutches. Because of his physical condition, other children picked on him and made fun of him. Defendant argues that, after going through surgeries and rehabilitation for his Perthes disease, he had a major setback in 1991 when he was in a car accident. He contends that because of his physical condition, he stopped attending school beginning around October 1990, received home instruction instead, and did not attain an education level beyond seventh grade. He argues that the trial court minimized the effect his physical problems had in preventing his education, social development, and maturation.

¶ 74    As to his ability to consider the risks and consequences of his behavior, defendant takes exception to the trial court's statement that his prior juvenile offenses should have alerted him that crimes carry consequences but did not make an impression on him. Defendant contends that this statement was effectively a statement that defendant, as a juvenile, "should have known better," and demonstrated that the trial court did not properly account for his youth.

¶ 75    As to outside pressure, defendant argues that the trial court misconstrued the factor as applying only to the moment of the commission of the offense. He argues that the trial court failed to consider his dysfunctional environment, growing up in one of the "worst neighborhoods," and his inability to extricate himself from that environment.

¶ 76    Citing *People v Davis*, 2014 IL 115595, and *People v. Smolley*, 2018 IL App (3d) 150577, defendant asserts that even juvenile defendants convicted of double murder are redeemable and not necessarily among the rarest of incorrigible juveniles. Defendant concludes that the trial court

erroneously focused on retribution in sentencing him, ignoring the diminished role that retribution plays in justifying punishment for juveniles.

¶ 77    Finally, defendant argues that his life sentence also violated the Illinois Constitution's proportionate penalties clause. Ill. Const. 1970, art. I., § 11. He argues the clause provides even greater protection than the eighth amendment, and the clause requires penalties be imposed with the objective of restoring the offender to useful citizenship. Similar to his argument that his sentence violated the United States Constitution, defendant contends that the trial court did not properly account for his youth, his physical disability, or his education level, and that his sentence was disproportionate to his rehabilitative potential.

¶ 78    The State responds that the trial court properly considered the *Miller* factors in reaching its sentencing decision. While defendant argues that the trial court did not make an express finding of incorrigibility, the State contends that we should focus on its careful consideration of all appropriate factors, which reveals that the trial court properly concluded that defendant was among the rare juvenile offenders for whom life imprisonment was appropriate.

¶ 79    We hold that, under the circumstances of this case, defendant's sentence of natural life did not violate the eighth amendment of the United States Constitution nor the proportionate penalties clause of the Illinois Constitution. The United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. Inherent to the eighth amendment's prohibition on cruel and unusual punishment is the concept of proportionality. *People v. Homan*, 2017 IL 120655, ¶ 33. In the case of a juvenile offender accused of a serious offense, "there is a genuine risk of disproportionate punishment." *Id.* The United States Supreme Court has advised that, for purposes of sentencing, children are constitutionally different from adults. *Miller*, 567 U.S. at 471. Compared to adult offenders, juvenile offenders have less moral culpability and greater

rehabilitative potential. *People v. Luna*, 2020 IL App (2d) 121216-B, ¶ 21. They lack maturity, have a higher vulnerability to negative influences and outside pressures, and their character is less well formed. *People v. Walls*, 2020 IL App (2d) 130761-B, ¶ 74 (slip opinion filed September 29, 2020, not yet released for publication). Accordingly, the Supreme Court in *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. *Holman*, 2017 IL 120655, ¶ 33; see also *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016) (holding that *Miller* applies retroactively); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (juvenile offenders cannot be sentenced to death); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (juveniles cannot be sentenced to life without parole for a non-homicide offense).

¶ 80     "The constitutional flaw with mandatory life sentences is their mandatoriness." *People v. Lusby*, 2020 IL 124046, ¶ 33 (slip opinion filed October 22, 2020, not yet released for publication). *Miller* did not foreclose discretionary life sentences for juveniles, but instead, trial courts must appropriately consider the offender's youth and attendant characteristics before imposing such a sentence. *Id.* A juvenile defendant may be sentenced to life imprisonment without parole only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. *Holman*, 2017 IL 120655, ¶ 46. In finding that a juvenile defendant's conduct supports a life sentence without parole, the trial court must consider the non-exhaustive list of the following *Miller* factors: (1) the defendant's chronological age at the time of the offense as well as any evidence of their particular immaturity, impetuosity, and failure to appreciate the risks and consequences of their actions; (2) the defendant's family and home environment; (3) the defendant's degree of participation in the homicide and any evidence they were subject to family or peer pressure; (4) the defendant's incompetence, including inability to deal with officers or assist their attorneys; and (5) the

defendant's prospects for rehabilitation. *Id.*; *Lusby*, 2020 IL 124046, ¶¶ 37-52 (applying the five *Holman* factors).

¶ 81    No single *Miller* factor is dispositive, and whether the trial court made an informed sentencing decision is based on the totality of the circumstances. *Lusby*, 2020 IL 124046, ¶ 35. Moreover, a trial court need not make an explicit finding that the defendant showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation, and such a determination can be inferred from the trial court's comments. *Walls*, 2020 IL App (2d) 130761-B, ¶ 83; see *Montgomery*, 136 S. Ct at 735 (explaining that *Miller* did not require trial courts to make a finding of fact regarding a juvenile's incorrigibility). Our supreme court has found that the consideration of *Miller* factors is consistent with the application of section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2020)), whose factors in mitigation were taken from the Supreme Court's list. *People v. Buffer*, 2019 IL 122327, ¶ 36; *Holman*, 2016 IL 120655, ¶ 45. Whether a criminal sentence is constitutional is a legal question that we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 82    Following defendant's new sentencing hearing, the trial court considered all the mitigating factors listed in section 5-4.5-105(a). Those factors were as follows:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or development disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a)(1)-(9) (West 2016).

We summarized in detail the trial court's consideration of the statutory mitigating factors, *supra* ¶¶ 49-60. After discussing the evidence relevant to each factor, the trial court acknowledged that defendant had had "somewhat of an unsettled family life with his father having been deported and his brother involved in gang activity." But it did not believe defendant was someone who had limited control over his environment. Based on the evidence, the trial court found that defendant was not unable to extricate himself from negative influences but in fact made the choice to be involved in criminal activity. The trial court found this was true not only for the instant case but also for defendant's other juvenile criminal activities. It found that his actions were not the product of outside pressure or impulsivity but were planned activities. It stated that it could not ignore the seriousness of the crimes committed three months before he turned 18, which were the fatal shootings of two individuals without provocation.

¶ 83    The trial court concluded in its sentencing order as follows:

"This court has now considered all relevant factors as required by the U.S. Supreme Court in Miller and the Illinois Supreme Court in Holman. The court has considered the juvenile's age at the time of the offense and any evidence of his particular immaturity,

- 25 -

impetuosity and any failure to appreciate risk and consequences. The court has considered the petitioner's family and home environment, his degree of participation in the crimes committed and any evidence of familial or peer pressures that may have affected him. The court has considered any incompetence on the part of the petitioner including any inability to deal with police officers or prosecutors and his capacity to assist his own attorneys. The court has considered the petitioner's prospects for rehabilitation at the time of his original sentence and even while in the Department of Corrections, although the later [*sic*] is not required by <u>Holman</u>. Having considered all of these factors as set forth and explained in this opinion, the court concludes petitioner's original sentence to natural life imprisonment was correct. Petitioner's request to be sentenced to something less than life imprisonment is denied."

¶ 84    The trial court's sentencing decision passes constitutional muster. While defendant argues that the trial court's examination of his rehabilitation potential was brief and mixed, the sentencing order demonstrated that the trial court carefully weighed both the State's and the defendant's evidence of rehabilitation from the sentencing hearing. It ultimately placed the greatest emphasis on the evidence of defendant's continued misbehavior in prison. Unlike in *Holman*, we are not revisiting an original discretionary sentence to examine whether that sentence was constitutional. Instead, the trial court fashioned a new sentence after defendant's mandatory life sentence was vacated. Therefore, it was reasonable for the trial court not only to examine defendant's forward-looking prospects for rehabilitation at the time of his original mandatory sentence but also to consider evidence whether defendant had been rehabilitated in the over two decades since his original sentence. See *United States v. Briones*, 929 F. 3d 1057, 1067 (9th Cir. 2019) (reaffirming that when a substantial delay occurs between a defendant's initial crime and later sentencing, the

defendant's post-incarceration conduct is especially pertinent to a *Miller* analysis); see also *Montgomery*, 136 S. Ct. at 736 (explaining that evidence of positive behavior in prison would be relevant as one kind of evidence of rehabilitation).

¶ 85    While defendant's pursuit of educational advancement in prison is laudable, his multiple disciplinary infractions while incarcerated weighed against his rehabilitation. Those infractions included citations for his threat in 2008 to kill his cellmate and his letter from two days later that stated that "[m]y only regret is I didn't get to bash that bitch-ass celly [*sic*] of mine's skull in." The trial court also heard testimony from Starkey that defendant was a gang member in prison and even held a leadership position with the Latin Folk. This testimony showed that defendant had not moved on from past negative influences.

¶ 86    In addition, the trial court implicitly rejected Rabideau's opinion that defendant was a model prisoner, writing that "[h]is conduct while in the penitentiary has been less than that of a model prisoner." Moreover, Rabideau's testimony covered only two years of defendant's incarceration, and she acknowledged defendant sending her an inappropriate letter during that time.

¶ 87    Nor did the trial court minimize defendant's physical problems or the circumstances of his childhood. It acknowledged defendant's Perthes disease, his use of crutches, his father's deportation when he was a child, his lack of a high school education, and his older brother's gang affiliation. On the other hand, the trial court did not find any evidence of parental neglect beyond his father's deportation, no evidence of parental abuse, and no evidence of childhood trauma beyond defendant's Perthes disease. It cited defendant's loving relationship with his mother, and the record showed that Rodriguez tried to dissuade defendant from gang life but was unsuccessful. The trial court emphasized the lack of peer or familial pressure on defendant to commit the

shootings, and the evidence supported its finding that defendant planned and carried out the shootings alone. We further note that no one *Miller* factor is dispositive but that the sentencing decision is to be based on the totality of the circumstances.

¶ 88    Next, we find *Davis* and *Smolley* unpersuasive. *Davis* simply affirmed the vacation of a mandatory life sentence (2014 IL 115595, ¶ 43), and the eventual reduction of the *Davis* defendant's life sentence to two concurrent 60-year terms was pursuant to a joint motion for summary disposition, which we do not have in this case.[2] In *Smolley*, the appellate court held that the trial court did not consider the *Miller* factors, failing to ever mention defendant's youth and its attendant characteristics, and therefore vacated the sentence and remanded for a new sentencing hearing. 2018 IL App (3d) 150577, ¶ 22. In contrast, the trial court here went through a thorough discussion of the *Miller* factors via the section 5-4.5-105 factors in mitigation.

¶ 89    Lastly, we reject defendant's argument that the sentence was unconstitutional because it failed to make a specific finding of depravity, incorrigibility, or corruption beyond rehabilitation. As noted in *Walls*, 2020 IL App (2d) 130761-B, ¶ 83, the trial court did not need to make such an explicit finding. The trial court's full discussion of all statutory and *Miller* factors, recounted at length in this disposition, is sufficient to infer that it believed defendant was either irretrievably depraved, permanently incorrigible, or beyond rehabilitation. To hold otherwise would be to exalt form over substance.

---

[2] As an aside, we note that a 60-year term would currently be considered a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶ 40 (juvenile sentences greater than 40 years are *de facto* life without parole sentences).

¶ 90    Turning from his eighth amendment argument, we also reject defendant's argument that his sentence violates the Illinois Constitution's proportionate penalties clause. Article I, section 11 of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) is commonly referred to as the proportionate penalties clause. *People v. Harris*, 2018 IL 121932, ¶ 17. It provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Here, the trial court addressed both the seriousness of defendant's offenses and the evidence of his prospects for rehabilitation. In fact, the trial court specifically mentioned that the seriousness of defendant's offenses could not be ignored.

¶ 91    While defendant argues that the Illinois Constitution provides "even greater protection" than the eighth amendment, he does not explain how it would provide greater protection in this case. In support, he cites *People v. Clemons*, 2012 IL 107821, ¶ 40, but *Clemons* did not address the issue of juvenile life sentences. Instead, it considered the continued application of the identical elements test as part of proportionate penalties clause jurisprudence. Contrary to defendant's argument, Illinois courts have generally found the proportionate penalties clause to be co-extensive with the eighth amendment's cruel and unusual punishment clause. *People v. Patterson*, 2014 IL 115102, ¶ 106; *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶ 31.

¶ 92    Accordingly, defendant's life sentence was not unconstitutional.

¶ 93                                B. Expert Witness Funding

¶ 94    Defendant next argues that the trial court erred in denying his motion for funding for an expert witness to testify at his sentencing hearing in mitigation. He argues that denying him the funds prevented the introduction of critical evidence of his rehabilitation. Defendant emphasizes that he had been incarcerated for 20 years and had lost contact with many potential mitigating

witnesses, including his father, who had been absent due to deportation since he was a child; his mother, who had died in 2003; his sister; and his brother Michael, who had died a year earlier. Defendant argues that only an expert could have synthesized the complicated and continually advancing science of the juvenile brain. He contends that the trial court misunderstood the critical role rehabilitation plays in sentencing juvenile defendants, citing Supreme Court case law explaining that only a small portion of children who commit crimes develop an entrenched pattern of problematic behavior and that different parts of the brain control behavior in children than in adults.

¶ 95    Defendant asserts that no Illinois case has addressed whether it is error to deny funding for an expert witness at a resentencing hearing involving application of *Miller* factors. He cites *United States v. Pete*, 819 F.3d 1121 (9th Cir. 2016), arguing that it supports the denial of expert funding was an abuse of discretion. He acknowledges that *Pete* is not binding on this court, but he argues its reasoning is persuasive and should be applied here. See *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 31 (explaining that lower federal courts are not binding upon Illinois courts but may be persuasive).

¶ 96    Defendant acknowledges that he did not raise the denial of his motion for expert witness funding in his post-sentencing motion, but he argues that we may still review the issue for plain error. He argues that plain error applies under both prongs because (1) the evidence was closely balanced and (2) the clear error was so serious that it affected the fairness of the sentencing hearing.

¶ 97    The State responds that the trial court did not abuse its discretion in denying defendant's motion for funds for an expert witness. The State argues that such a witness was not necessary for defendant to present evidence in mitigation at his sentencing hearing. The State also argues that *Pete* is an outlier and distinguishable.

¶ 98    We review a trial court's denial of a motion for expert witness funds for an abuse of discretion. See *In re T.W.*, 402 Ill App. 3d 981, 986 (2010). Defendant concedes that the issue was not properly preserved for appeal, and he therefore asks us to review whether the denial of funds for an expert witness constituted plain error. The plain-error rule bypasses normal forfeiture principles and, under specific circumstances, allows a reviewing court to consider unpreserved claims of error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The first step in a plain error analysis is to determine whether there was any clear or obvious error. *People v. Foster*, 2020 IL App (2d) 170683, ¶ 49. If a clear error is established, the party asserting plain error must show one of two prongs: either (1) the evidence was so closely balanced that the error threatens to tip the scales of justice, regardless of the seriousness of the error; or (2) the error was so serious it affected the fairness of the proceedings and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Olla*, 2018 IL App (2d) 160118, ¶ 27.

¶ 99    Here, the trial court's denial of funding for an expert witness did not constitute a clear or obvious error, and we therefore do not reach either of the two prongs for plain error. While defendant contends that he had lost touch with potentially mitigating witnesses, he was still able to call his brother and his IDOC counselor to testify at the sentencing hearing, and he testified on his own behalf. As the State argues, the trial court also had access to defendant's presentence reports and IDOC records. Moreover, defense counsel could not provide an estimated cost for the expert witness because she had not yet found a specific witness candidate.

¶ 100   We note that, unlike at the initial sentencing hearing, the trial court did not have to speculate at the new sentencing hearing as to how defendant might rehabilitate over his next 20-plus years in prison. It was able to hear evidence not just of defendant's *potential* for rehabilitation but evidence for and against his actual rehabilitation. While an expert witness undoubtedly could

provide helpful testimony toward assessing a juvenile's potential for rehabilitation, any necessity of such testimony was diminished in this case, given the extensive opportunity for defendant's actual rehabilitation over the past two decades. As discussed *supra* II.A., the trial court weighed the evidence for and against defendant's rehabilitation, and it concluded that the evidence was "not particularly strong that his years in the penitentiary to date have corrected or reformed his conduct."

¶ 101   Finally, we decline defendant's invitation to follow *Pete*. There, the defendant, who was convicted of several crimes committed when he was 16, including second-degree murder, requested an expert witness pursuant to federal statute. *Pete*, 819 F.3d at 1124, 26. He identified a specific expert, and he explained how the witness would assist him with at his resentencing hearing. *Id.* at 1126. He stated that the witness would conduct a comprehensive neurophysical evaluation that would show the defendant's "mental age," whether he had cognitive dysfunction, and whether he had any particular mental disorders that may have affected his behavior. *Id.* at 1126. The district court denied the motion. *Id.* at 1127.

¶ 102   In reversing the district court, the Ninth Circuit Court of Appeals discussed the necessity of the expert witness, emphasizing the defendant's potential for psychological change over time. *Id.* 1130-33. Toward the end of its analysis of necessity, the Ninth Circuit stated:

> "To be sure, [the defendant] could have done a better job in his motion for an expert of explaining the ways in which the expert would aid his defense. But [the defendant] did identify the issues he hoped the neuropsychologist would address—mitigating evidence in the form of an analysis of [the defendant's] development and maturity since the offenses, as well as the impact incarceration had had on him." *Id.* at 1133.

The Ninth Circuit went on to find that the denial of the expert witness funding prejudiced the defendant. *Id.* at 1133-34.

¶ 103   We find *Pete* unpersuasive for several reasons. First, defendant never identified who he wanted to obtain as an expert or what the expert would testify to beyond "testimony regarding mitigating factors" and "rehabilitation specifically." In contrast, the *Pete* defendant identified who would testify and what they would testify to—specifically, what defendant's "mental age" was, whether he had cognitive dysfunction, and whether he had any mental disorders. Even then, the Ninth Circuit felt compelled to remark that the defendant could have better explained the purpose of the expert witness. Here, defendant's lack of specificity in seeking funding for an expert witness weighs strongly against a holding that the witness was necessary and that the denial of funding was an abuse of discretion amounting to clear error.

¶ 104   Second, the *Pete* defendant requested an expert witness under a federal statute, and the Ninth Circuit reviewed whether the district court abused its discretion in applying the federal statute. The statute, section 3006A(e)(1) of the United State Code (18 U.S.C. § 3006A), provided that upon a finding that the services are necessary and that the person is financially unable to obtain them, the court "*shall* authorize counsel to obtain services." (Emphasis added.) In contrast here, defendant's motion for expert witness funding was based on section 113-3(d) of the Code of Criminal Procedure of 1963 (725 ILCS 5/113-3(d) (West 2016)), which provided that "if the court determines that the defendant is indigent the court *may* *** order the county Treasurer of the county of trial to pay necessary expert witnesses for defendant reasonable compensation." (Emphasis added.) Therefore, the federal district court's discretion ("shall") was arguably more limited than the trial court's ("may"), and we believe it unwise to base our interpretation of Illinois law on the interpretation of a differing federal statute.

¶ 105   Lastly, unlike the defendant in *Pete*, defendant is arguing plain error, and plain error constitutes "more than arguable error; it is a 'clear or obvious error.' " *People v. Stevenson*, 2020 IL App (4th) 180143, ¶ 14.

¶ 106   Accordingly, the trial court did not abuse its discretion in denying defendant's motion for expert witness funds, because there was no clear error to support plain error.

¶ 107                              C. Gang Activity Testimony

¶ 108   Defendant's final argument is that the trial court abused its discretion when it relied on Starkey's testimony and the State's accompanying exhibits purporting to show defendant's gang membership in prison. He argues that Starkey's testimony that defendant was a gang member was based on multiple levels of uncorroborated hearsay. He also argues that several of the memos the State introduced, including exhibit 17 (a copy of a handwritten roster, allegedly created by a Latin Folk member identifying gang members in IDOC, including defendant) and exhibit 20 (IDOC memo from March 2013, reporting that an informant told investigators that defendant had ordered a Latin Folk member to carry out an assault on another member), were heavily redacted and based on confidential informants that could not be questioned or cross-examined.

¶ 109   While defendant acknowledges that the ordinary rules of evidence are relaxed at a sentencing hearing, he argues that the trial court completely disregarded the rules. He argues that the trial court never ensured the accuracy of the allegations of defendant's gang involvement and that defense counsel received the redacted documents only two weeks before the sentencing hearing, preventing an investigation of the claims therein.

¶ 110   The State responds that the redactions were necessary to protect confidential informants, which included other inmates. The State also emphasizes that the trial court examined Starkey at

the conclusion of his testimony, asking him a series of questions about the veracity of the confidential informants and the memos based on their information.

¶ 111   We reject defendant's argument. In Illinois, it is well settled that at a sentencing hearing, the ordinary rules of evidence are relaxed. *People v. Harris*, 375 Ill. App. 3d 398, 408 (2007). Undergirding the relaxation of evidentiary standards are that the defendant's guilt has already been settled and that the trial court's fashioning of an appropriate sentence requires " 'possession of the fullest information possible concerning the defendant's life and characteristics.' " *People v. Rose*, 384 Ill. App. 3d 937, 940-41 (2008) (quoting *People v. Adkins*, 41 Ill. 2d 297, 300 (1968)). A sentencing court can consider not only a defendant's previous conviction but also crimes for which the defendant was not convicted, not prosecuted, and even acquitted. *Id.* at 941.

¶ 112   Thus, for evidence to be admissible at a sentencing hearing, it need be only relevant and reliable. *Id.* This includes hearsay evidence. See *People v. Bilski*, 333 Ill. App. 3d 808, 818 (2003) ("Hearsay is admissible."); see also *Harris*, 375 Ill. App. 3d at 409 (hearsay evidence at sentencing hearing does not deny the defendant's right to confront witnesses). A hearsay objection at a sentencing hearing goes toward the weight of the evidence rather than its admissibility. *People v. Varghese*, 391 Ill. App. 3d 866, 873 (2009). If the evidence is double hearsay, it should be corroborated, at least in part, by other evidence. *Id.* In addition, hearsay evidence should be presented in the form of live testimony rather than as an attachment to a presentence report. *People v. Raney*, 2014 IL App (4th) 130551, ¶ 44. Whether evidence is reliable and relevant is a determination within the trial court's discretion. *Varghese*, 391 Ill. App. 3d at 873.

¶ 113   Here, the trial court did not abuse its discretion in considering evidence of defendant's gang membership in its sentencing decision. First, whether defendant was a gang member in prison was relevant to the trial court's sentencing decision, going toward defendant's rehabilitation. Gang

membership would tend to show that defendant was not reformed from the person he was when he first entered prison. The evidence of defendant's gang membership in prison showed that instead of relinquishing a negative influence on his life, defendant continued to embrace it.

¶ 114 Second, Starkey's live testimony was reliable. He testified that he was the chief investigator at the Stateville Correctional Center, and he had previously held other roles with IDOC. He was involved in identifying gangs at IDOC, and it was his opinion that defendant was a gang member. While defendant objected to some of the confidential informant reports that Starkey summarized because they were heavily redacted and hearsay, hearsay objections do not go toward the admissibility of evidence at a sentencing hearing. The trial court understood that the redactions were necessary to protect the confidential informants. The trial court also questioned Starkey about how he judged the veracity of confidential informants, and he explained that confidential informants required years of reliable information to cultivate.

¶ 115 The State's exhibits, including reports from confidential informants, corroborated Starkey's opinion that defendant was a gang member. Furthermore, defendant was one of the relatively few inmates placed in administrative detention in response to three violent assaults on staff members by Latin Folk. He was placed in administrative detention because of his identification as holding a leadership role with the Latin Folk, further corroborating Starkey's opinion that defendant was a gang member.

¶ 116 Accordingly, the trial court did not abuse its discretion when, in fashioning defendant's sentence, it considered evidence of his gang membership.

¶ 117                                     III. CONCLUSION

¶ 118 For the reasons stated, we affirm the judgment of the Du Page County circuit court.

¶ 119 Affirmed.